Filed 5/28/15  P. v. Andrews CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B254677 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA386577) |
| v. | |
| MICHAEL ANDREWS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed with modifications.

Law Office of Jennifer M. Hansen and Jennifer M. Hansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Michael Andrews was convicted, following a jury trial, of one count of first degree murder in violation of Penal Code section 187, subdivision (a), one count of premeditated attempted murder in violation of Penal Code sections 187 and 664 and one count of being a felon in possession of a firearm in violation of Penal Code section 12021, subdivision (a)(1). The jury found true the allegations that these crimes were committed for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b)(1). The jury also found true the allegations that a principal personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b) and personally and intentionally discharged a firearm within the meaning of Penal Code section 12022.53, subdivision (c), in the commission of the murder and attempted murder. The jury also found true the allegation that, with respect to the murder, the principal's discharge proximately caused death within the meaning of Penal Code section 12022.53, subdivision (d). The trial court sentenced appellant to a total term of 50 years to life in state prison, consisting of a term of 25 years to life for the murder conviction, plus a 25-year-to-life term for the Penal Code section 12022.53 firearm enhancement. The court also sentenced appellant to a concurrent term of 15 years to life for the attempted murder conviction plus a 20-year-to-life term for the Penal Code section 12022.53 firearm enhancement and a concurrent term of five years for the possession of a firearm conviction. The court imposed but stayed 10-year determinate terms for the Penal Code section 186.22 gang enhancement to the murder and attempted murder convictions.

Appellant appeals from the judgment of conviction, contending admission of two YouTube videos violated his constitutional rights to due process and a fair trial and admission of evidence he committed two previous murders violated Evidence Code[1] section 1101 and his constitutional rights to due process and a fair trial. He contends that if either of these claims have been forfeited, he received ineffective assistance of counsel. Appellant also contends the prosecutor committed misconduct during closing argument.

---

[1]     All further statutory references are to the Evidence Code unless otherwise specified.

2

He asks us to review the in camera transcript of his *Pitchess*[2] motion.  Both appellant and respondent contend the trial court's imposition of 10-year determinate terms for the gang enhancement must be stricken.  We agree the terms must be stricken.  We affirm the judgment of conviction in all other respects.

Facts

In the evening of June 17, 2010, Cynthia Parker was shot and killed while sitting in her car in front of a house at 5018 Wadsworth Avenue.  Her baby daughter was in the rear passenger seat but was unharmed.  The shooting occurred in an area claimed by the Ten Line Crips (Crips) gang.  The area had previously been claimed by the Blood Stone Villains (BSV) gang.

Police arrived at the scene at about 10:45 p.m.  Although there were 10 to 15 people in the street screaming and crying, ultimately only Shawanda Kelly provided a statement to the police.

According to Kelly, Parker had been visiting her and got in the car to go home.  Kelly said good-bye and went into the house.  She heard the sound of what she thought were firecrackers and then heard Parker's car horn.  Kelly walked out to find Parker wounded and unresponsive.

Kelly told police the baby's father was Kenyae Rollins and that he and Parker had been in an argument before the shooting.  At some point, Rollins kicked in the front of Parker's car.  Parker believed Rollins was cheating on her.

Rollins heard about the murder the next day when Parker's sister called him and said, "Boy, I'm going to whoop your ass if you had anything to do with my sister getting shot."  Rollins found the inhabitants of the Wadsworth house hanging out together at 98th and Main.  Everyone there gave him a "run down" of what happened.

Wanda Boyd told Rollins that she had been standing at the side of the car with her relative Larry Shidie, talking to Parker.  Shidie is a Crips gang member.  Boyd said she

_____

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

3

saw a man fumbling with his belt nearby, then he got a gun and started shooting at Shidie and then at Boyd.

About a week after the shooting, Boyd visited Parker's grandfather, John Brider. Brider was taking care of Parker's child. Boyd told him she witnessed Parker's shooting. Boyd said she was talking to Parker when a man came around the corner in the darkness. Parker flashed her lights to try to identify the man. The man was chasing her nephew and shooting at him. After her nephew left, the man shot at Boyd and she ran away. Boyd did not tell Brider the name of her nephew.

Rollins began conducting his own investigation. He learned from Shidie that Boyd's son "Ghetto," a Crips gang member, had a picture of the "dude that did the shooting." Rollins went to see Ghetto the next day. Ghetto had about three photos. Rollins took a picture of one of the photographs with his cell phone. Rollins then asked people about the pictures and someone volunteered that the person in the picture was a BSV gang member. He showed the picture to Boyd and Shidie. Shidie indicated that the image was of the shooter, but Boyd was not sure.

On June 21, 2010, Rollins met with Los Angeles Police Detectives Tommy Thompson and Leonardo McKenzie. A few weeks later, Rollins electronically provided the detectives with a digital copy of his photograph of Ghetto's photograph. According to Detective McKenzie, Rollins told them Boyd positively identified the image in the photograph as the shooter.

At some point, Detective McKenzie showed the image provided by Rollins to other gang officers who suggested that it was "Chabo," a member of the BSV gang. Searching for that moniker in department resources, he found a photograph of appellant.

On March 23, 2011, Detectives McKenzie and Thompson interviewed Kenneth Jones, who was in custody on a possession for sale of PCP case. Detectives told him, "We have a guy that's saying you did something."

Detectives showed Jones the photograph from Rollins and asked Jones if he knew the person in the picture as "Chabo." Jones claimed he met appellant, whom he knows as "Chabo," through Tavar Thomas, a BSV member known as "CK Bell." Bell referred

4

appellant to Jones for a security job at a night club. Later, Jones fired appellant for stealing alcohol. Appellant was angry about being fired.

Bell was shot outside the "Bottums Up" recording studio, a BSV hang-out, on May 30, 2010. Jones told police that on June 17, 2010, he was hanging out with a bunch of people at 51st and Central. Appellant was there, both drunk and high and "talking nonsense." He said, "Bell, my brother, Bell this, Bell that, woo, da, woo, woo, woo. Whew, uh, no ain't nobody going to do nothing? . . . Ain't no motherfucker ain't fixing to do shit . . . I got him and that's my brother. He in the hospital, woo, woo, woo, woo." Appellant asked if anyone had any "heat," which is street slang for a pistol. Later, Jones heard shots.

Jones was an extremely uncooperative witness at trial, and repeatedly denied making statements to police. When the prosecutor played the audio tape of his police interview, he said his statements to the detectives during the interview were lies because he was not "sworn in." According to Jones, the detectives accused him of the murder and he felt threatened that they would "put a case on [him]" if he did not tell them what they wanted to hear. Detectives played a tape for him of appellant pointing the finger at him. He was told "you're the one who is probably going to eat this," and "you're going to get rung the fuck up." Jones was angry at appellant during the interview and was still angry at him at the time of trial for accusing him of the murder and getting him involved in the case.

In July 2011 Detectives McKenzie and Thompson interviewed Shidie. Shidie was undergoing court ordered drug rehabilitation at the time. Shidie told the detectives he got off work at approximately 7:00 p.m. on June 17, 2010, and went to Boyd's house in the 5000 block of Wadsworth where family members were watching the Lakers game. The house is known as a Crips hang-out area. While there, he drank a pint of tequila and smoked a blunt. At the time, he was an alcoholic and tequila did not make him drunk, in his opinion. He had been drinking since age nine.

Shidie went outside and saw Boyd was standing by the driver's side door talking to Parker, in the front seat of the car. He noticed a man walking down the street, going

5

on and off the curb. The man came to the back of Parker's car, on the rear passenger side, and started to "go for his waistband." Shidie kicked the gate in front of the house to avoid being shot. He was about two feet away from the man before Shidie took off running toward 51st Street and toward Avalon Boulevard. Shidie was zigzagging down the street to avoid being shot. For a moment, he stopped by a light pole and a bullet passed his right foot and hit the ground. He heard about six more shots as he was running. About 30 minutes later, he returned to see the streets were blocked off by police. Shidie was arrested in Long Beach for robbery about a month after the murder.

The detectives showed Shidie the cell phone image provided by Rollins. Shidie said he recognized the shooter from a funeral for his cousin Tommy Kirkpatrick back in 2006 or 2007. Shidie's first reaction to the photo was, "He kind of looked the same." As the interview went on, the identification became more "solid." The funeral was the first and last time Shidie ever saw appellant, until the night of the shooting. Shidie identified appellant in the courtroom as the shooter he saw that night.

Although he initially denied getting money from the police, Shidie admitted that he did get paid by the police for his relocation. Around the time of the preliminary hearing, Shidie told the previous deputy district attorney that he was concerned about "snitching" and that something bad might happen to him. The prosecutor now assigned to the case suggested he could be relocated. Over the course of three months he was paid a total of $2,700, for rent, meals and incidentals. Shidie understood that if he did not testify in this case, he would be in contempt of court and have to serve six years in prison for the robbery he did in Long Beach.

At trial, Los Angeles Police Officer Brian Cooney testified as a gang expert. He is familiar with the BSV gang. The gang has been in existence since the 1970s, is associated with the color red, and controls a territory in South Los Angeles. The gang's primary activities are vandalism, narcotics sales, robberies and murders. At the time of this shooting, there were approximately 170 BSV gang members. Three predicate crimes committed for the BSV gang were admitted, including a 2006 assault conviction of appellant.

Officer Cooney found a rap video about BSV on YouTube which was played for the jury in which gang hand signs were shown. Appellant is shown in the video making gang hand signs and holding a gun behind his back. Officer Cooney opined that the video was shot at the Bottum's Up recording studio.

A second YouTube video was also posted online. In it appellant is talking to a documentarian holding a camera and asking him questions. Appellant boasts about his gang membership and exploits, including a prior murder he committed as a juvenile, when he was considered a "menace to society." He says he does not do drive by shootings and instead does "walk up" shootings and he considers himself "trigger happy" and is willing to shoot at anyone or anything. In the video, at one point, he is holding a "granny" gun, which he says is old. He brags about drug use, and throws plastic wrapped crack cocaine on the carpet while others in the room laugh.

In Officer Cooney's opinion, when appellant suffered his previous conviction in 2006, appellant was a documented member of BSV with the moniker of "Chabo." Appellant was sentenced to four years in prison for his 2006 conviction, but since his release from prison, there is no documentation as to where appellant lives or whether or not he still associates with the gang. However, in Officer Cooney's opinion, no one can ever disassociate from a gang and anyone who has gang tattoos is an active gang member. Appellant has various gang tattoos on his body, including one that probably indicates he killed a rival Crip gang member.

Officer Cooney explained that the immediate area where the shooting occurred is controlled by the Crips. Previously, the neighborhood was controlled by BSV, but then Crips started to move in. Crips graffiti was seen around the area of the shooting. The incursion of the Crips gang members was causing tension in the neighborhood as it was seen as disrespectful to BSV.

In response to a hypothetical mirroring the facts of this case, Officer Cooney opined that the crimes were committed "for the benefit of, at the direction of or in association with a criminal street gang." In his opinion, the shooter was working on behalf of the BSV gang because he shot at a rival gang member in retaliation for the BSV

7

gang member who was shot 17 days earlier. The crime established fear among rival gangs and demonstrated the gang's potential for violence.

Discussion

1. Admission of YouTube videos

Appellant contends the trial court abused its discretion in admitting the two videos found on YouTube because the videos were not authenticated, were old, were cumulative and were extremely prejudicial. He contends this error violated his Fourteenth Amendment rights to due process and a fair trial. The trial court did not abuse its discretion. There was no violation of appellant's constitutional rights.

a. Authentication

Authentication of a writing, including a photograph, is required before it may be admitted in evidence. (§§ 250, 1401.) Authentication is determined by the trial court as a preliminary fact. (§ 403, subd. (a)(3).) Authentication is defined as "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or . . . the establishment of such facts by any other means provided by law." (§ 1400.)

"As with other writings, the proof that is necessary to authenticate a photograph or video recording varies with the nature of the evidence that the photograph or video recording is being offered to prove and with the degree of possibility of error. (Annot., Authentication or Verification of Photograph as Basis for Introduction in Evidence (1950) 9 A.L.R.2d 899, 900.) The first step is to determine the purpose for which the evidence is being offered. The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case. (2 [Broun,] McCormick, [on Evidence (7th ed. 2013) Authentication] § 221, pp. 82–83.) The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1434–1435 (*Valdez*).) Essentially, what is necessary is a prima

8

facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.)" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266-268.)

"A photograph or video recording is typically authenticated by showing it is a fair and accurate representation of the scene depicted. [Citations.] This foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded. [Citations.] It may be supplied by other witness testimony, circumstantial evidence, content and location. [Citations.]" (*People v. Goldsmith, supra,* 59 Cal.4th at pp. 267-268.)

Here, the prosecutor relied on the testimony of gang expert Officer Cooney and the contents of the videos for authentication. Officer Cooney testified that it was very common for gangs to post videos on the internet, and police used the videos on a daily basis to obtain information about gangs. According to the officer, gangs "love to put this stuff out there." The videos were discovered in an internet search using the name of the gang.

There was no clear evidence showing when the videos were posted on YouTube. Dates ranged from 2006 through 2008. The creation of the interview video (Exhibit 5) can be dated from appellant's statement that he is "28 right now." Appellant was born in July 1977. Thus, the video was filmed sometime between July 2005, when appellant turned 28, and July 2006, when he turned 29. There is no information showing when the music video (Exhibit 1), was made, although it appears undisputed that it was made before appellant's last prison term, which began in late 2006. Since the people in Exhibit 1 also appear in Exhibit 5, and there is a similarity of clothing in the two videos, it is reasonable to infer that the two exhibits are of a similar age. The crimes in this case occurred in June 2010, making the videos four or five years old at the time of the crimes.

Both videos were offered by the prosecution to prove various aspects of the gang enhancement. The Exhibit 1 music video was offered primarily to show the existence of BSV as a criminal gang consisting of three or more persons with common signs and

9

symbols and a pattern of criminal activity, and to show appellant's membership in the gang. The Exhibit 5 interview video was offered to show a pattern of criminal activity by BSV, appellant's involvement in BSV and his access to a firearm similar to the one used in the murder.

Officer Cooney described Exhibit 1 as a rap video. This matches the content of the video, which contains shots of one or more persons wearing headphones and singing in front of a microphone and also shots in which a number of people are moving in time to the music. In both interior and exterior scenes, many of the people are looking into the camera and making gestures, demonstrating that they are aware they are being filmed. The video is a montage of still photos and video clips. Thus, the video clearly depicts a performance.

Officer Cooney testified that he recognized appellant in the video, and there appears to be no dispute that he is in the video. Officer Cooney also testified that he recognized the gestures made by the people in the video, including appellant, as gang signs for the BSV gang. Virtually everyone in the video is wearing red, the color associated with BSV. Many are wearing matching black or white T-shirts.

Officer Cooney believed the video was made at Bottum's Up, a recording studio at 5020 South Central which was a BSV gang hang-out. The video contains some images which appear to be the inside of a recording studio. As appellant's trial counsel pointed out, other images in the video show the outside of the Fun Zone, a business located at 5513 South Hooper, a few blocks away from Bottum's Up. Some interior images appear to have been shot at the Fun Zone as well. The Fun Zone was also a BSV hang out.[3]

Officer Cooney's testimony, plus the contents of the video, is sufficient to support a finding that the video is authentic, that is the video is a rap music video made by a group of BSV gang members at one or more of their gang hangouts, to celebrate or promote BSV and its lifestyle.

_____

[3]     According to a map used by the defense during the cross-examination of Officer Cooney, the Fun Zone appears to be in territory claimed by BSV. (Def. Exhs. A & B.)

Exhibit 5 shows what appears to be an informal interview of appellant by an unidentified filmmaker. It too appears to be a video celebrating or promoting BSV. Thus, the content of the videos matches the circumstances of Officer Cooney's discovery of it on YouTube. The video was clearly designed for an audience. It has been edited in several places. There is an opening title sequence with the words "Bloodstone Villains" with music playing.

This video shows appellant and several other gang members in a small room with two couches, talking. Appellant speaks about being a BSV gang member, about BSV's rivalry with other gangs and about narcotics sales. Appellant and another man take turns holding a revolver during the video. Throughout the video, appellant and the others use gang slang such as "crabs" and "granny." Appellant frequently looks at the camera while speaking, and there can be no doubt that he is aware that he is being recorded.

As the trial court noted, there are indications that the conversation in the video was not spontaneous. At various points, the person filming the video asks appellant a question and receives a response. Some questions suggest the film is meant for an audience, perhaps outside the BSV gang. For example, the filmmaker refers to a firearm and says, "Man I see you stay ready, huh, you – you was telling those niggas stay ready, huh?" The filmmaker also asks, "But you say you was on that water, huh? What's — what's — what's that, man for those that don't know?"

The contents of the video, together with Officer Cooney's testimony, are sufficient to support a finding that the video is authentic, that is the video was created to promote or celebrate BSV and its lifestyle for an audience.

b. Section 352 proceedings in the trial court

Appellant contends that even assuming the two videos were authenticated, the prejudicial potential of the videos outweighed any probative value, and so the court abused its discretion under section 352 in admitting the videos.

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a)

11

necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

A trial court's decision under section 352 will not be disturbed on appeal unless the court exercised its discretion in "'an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citations.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

The admissibility of the videos was discussed extensively, both in written motions and oral argument at several hearings.

Initially, the prosecutor filed a motion in limine to admit the videos, arguing that Exhibit 5 was relevant because it (1) showed appellant with a revolver, the same type of weapon used to commit the murder in this case; (2) showed appellant's motive for committing the crimes in this case; (3) showed appellant was a BSV member; (4) provided evidence of the gang's primary activities for purposes of Penal Code section 186.22; and (5) provided evidence of predicate acts for Penal Code section 186.22. With respect to gang membership, the prosecutor argued that the degree of appellant's loyalty to the gang indicated that he would not have left the gang after his most recent prison term as he claimed to have done. The prosecutor argued that Exhibit 1 was relevant "for the same reasons" given for Exhibit 5, and also to show the existence of BSV as a criminal gang consisting of three or more persons with common signs and symbols and a pattern of criminal activity, and to show appellant's membership in the gang.

In his written opposition, appellant argued that the videos, particularly Exhibit 5, lacked relevance because their contents were entirely speculative. He also argued that the contents were highly prejudicial because they could cause the jury to infer that appellant has a criminal disposition.

At the first hearing on the admissibility of the videos, the prosecutor made the same arguments as he had in his written motion. Appellant focused on the potential prejudice arising from showing appellant with a gun. He argued that the potential prejudice arose from the possibility that the jury would believe that the gun in the video was the murder weapon in this case. At the same time, the gun lacked relevance because

12

there was no way to know where the gun came from or to whom it belonged. In addition, appellant argued the age of the video meant it had no probative value as to gang membership at the time of the crimes in this case, but had the potential to mislead the jury into thinking appellant was still a gang member.

The court initially ruled, "Well, I do believe that both of the videos provide evidence that would be probative of certain facts that the People are obliged to prove. Even though they are prejudicial and could have the effect that you're talking about, [defense counsel], that is, connecting this .38 that was used in the murder, this .38 that was on your client's lap, that doesn't mean that I should exclude it. I don't think the evidence is unduly prejudicial in light of what the People have to prove. So I will be admitting, if the People offer them, both of those videos."

Later, after the Exhibit 1 video was played, appellant's counsel renewed his objections to the Exhibit 5 video, again focusing on potential prejudice from the gun. Appellant argued that the Exhibit 1 video had shown appellant carrying a gun, and similar images from the Exhibit 5 video would be cumulative. The matter was continued to the next court day.

The next court day, the court initially stated, "My inclination was to allow the People to use [the video] to show not only gang affiliation, but the pattern of criminal activity of the particular gang at issue here, which includes possession of a firearm and drug possession. [¶] And it's my understanding that the People agree that that would be admitted for those purposes only." Appellant repeated his argument that Exhibit 5 was unduly prejudicial because it focused on the gun. The court ruled, "I will admit the second video, the one that you believe that you will label 5. [¶] Arguably, it's scripted just like the first video, and we will leave it up to the jurors to decide whether or not [appellant] is a great actor reading a script, or he's talking to someone about something that just was happening or happened or his own feelings."

13

c.  Section 352 analysis – Exhibit 1

As appellant acknowledges in his reply brief, Exhibit 1 is "akin to 'traditional' gang evidence presented in gang cases.  The edited clips overlaid with rap music shows various gang members holding guns, making gang hand gestures, dancing and/or talking about neighborhood rivalries."  Thus, like other traditional gang evidence, Exhibit 1 is relevant to show the gang existed and met the statutory requirements of having a common name and identifying signs or symbols.  (Pen. Code, § 186.22, subd. (f).)  Exhibit 1 does not evoke a strong emotional response.  Thus, the trial court clearly did not abuse its discretion in finding the probative value of this video outweighed any potential for prejudice.

d.  Section 352 analysis – Exhibit 5

Appellant contends there was almost nothing of relevance in the Exhibit 5 video and any small relevance was eliminated by the four year gap between the production of the video and the commission of the crimes in this case.

The prosecutor contended that images showing appellant carrying a revolver were relevant and admissible because it was the same type of weapon used in this case, and courts have found evidence showing that the defendant had access to the same type of weapon used in the charged crime to be relevant and admissible.  Generally, however, such access must be close in time to the crimes.  (See, e.g., *People v. Webb* (1993) 6 Cal.4th 494, 520 [defendant had access to a .38-caliber revolver "shortly" before the murders]; *People v. Farnam* (2002) 28 Cal.4th 107, 156 [defendant possessed a knife two months after the crime].)  Evidence that a defendant had access to a specific but common type of weapon four or more years before a crime is committed with that common type of weapon has very little relevance.  There is no basis to infer that he would have that same access four years later, particularly since the weapon in question was characterized as a disposable one.

Other aspects of the video concerning firearms remained relevant.  The video showed appellant's familiarity with firearms, which would not diminish over time.

14

Appellant also discussed the gang's practice of having "granny" guns, which could be thrown away if necessary. Appellant's knowledge of "granny" guns had continuing relevance, particularly since Officer Cooney's testimony showed that gangs still used "granny" guns and the gun used in the shooting was never found, suggesting it was a disposable gun.

The prosecutor argued that appellant's statement, "I know I'm going to hit that Crab" showed motive for the shooting in this case. A "crab" is a Crip gang member. The video as a whole shows a heated animosity between BSV and rival Crip gangs, and also shows appellant shared in BSV's animosity towards Crip gang members. This evidence would support an inference that the shooting in this case, which involved Shidie, a Crip gang member, was done for the benefit of the BSV gang. While the probative value is diminished by the passage of four years or more between the statement and the shooting in this case, there was other evidence showing that the rivalry between BSV and the Crips was still ongoing at the time of trial. Given the intensity of appellant's feelings toward BSV and his animosity toward its rivals, together with other evidence of appellant's continued gang membership, it would be reasonable to infer that appellant remained in BSV and personally still shared BSV's animosity towards Crips at the time of the shooting. Thus, the video was relevant to show appellant's motive in committing the shooting was to benefit BSV. (See *People v. Valdez* (2012) 55 Cal.4th 82, 131 [where prosecution's theory was that defendant committed the killing of the victim at the direction of the Mexican Mafia, evidence showing level of defendant's commitment to gang, such as photos of defendant's tattoos and photos with gang member brandishing weapons, was relevant to show motive and intent].)

The prosecutor also relied on the video to show appellant's current gang membership. The video clearly shows that appellant considered himself a member of the BSV gang when the video was shot. However, that was four years before the crimes in this case. As appellant points out, there were no documented gang contacts involving appellant between the time he was released from prison and the shootings in this case, which appellant argued showed he was no longer an active gang member. The

15

prosecutor argued the intensity of appellant's loyalty to the gang, as shown in the video, made it unlikely that he quit the gang in the interval. Such an inference would be a reasonable one. Thus, appellant's past gang membership was relevant. (See *People v. Valdez, supra,* 55 Cal.4th at p. 131 [where defendant attempted at trial to show that he was no longer an active gang member at time of crimes, evidence showing level of defendant's commitment to gang, such as photos of defendant's tattoos and photos with gang member brandishing weapons, was relevant].)

The prosecutor contended that the video was proof of the primary activities of BSV. Even without considering the age of the video, the video provides at best extremely weak evidence of the gang's primary activities. At most, it shows that one gang member, appellant, committed the offense of prohibited possession of a firearm for the duration of the video and another three or four individuals, who are not identified and so not proven to be gang members, committed the offense of narcotics sales. Even assuming all five men in the video were BSV gang members, they represented a tiny fraction of BSV's membership, which numbered about 170 in 2010. The limited criminal acts of this tiny minority cannot prove the primary activities of the gang. Thus, at most, the video provided very slight corroboration for the prosecution's gang expert's testimony concerning BSV's primary activities.

The prosecutor argued that the video showed violations of Penal Code section 12021, subdivision (a)(1) and Health and Safety Code section 11351.5, both of which can be predicate crimes showings a pattern of criminal activity by a gang within the meaning of Penal Code section 186.22, subdivision (e). In fact, the prosecutor did not rely on either crime shown in the video as a predicate act. The prosecutor introduced evidence of the convictions of appellant and two other gang members to show the predicate acts. Those convictions did not include narcotics sales, and the jury was not instructed that a conviction for narcotics sales could show a pattern of criminal activity.

Thus, while the video did not have all of the relevance argued by the prosecutor, the video was relevant on several key issues which the prosecutor was required to prove.

16

The time lag between the production of the video and the commission of the crimes in this case diminished but did not destroy the relevance of the video's contents.

The trial court correctly recognized, although the gang evidence was relevant, it also had prejudicial potential, as does all gang evidence. On appeal, appellant argues Exhibit 5 is "a painfully long, profanity-laced commentary wherein appellant brags that he is a murderer and was considered a 'menace to society around this bitch.' He boasts that he is 'trigger happy' and he might 'shoot anything, anybody nigga. I don't give a fuck.' He throws wrapped packets of drugs on the ground, laughs and jokes about selling drugs. Appellant's attitude, provocative speech and his mockery of the established rule of society displayed in the video would be seen as highly offensive to any general member of the public. [¶] Watching appellant in Exhibit 5 triggers an emotional reaction of immediate disdain and inspires the urge to punish him for his unwaveringly arrogant attitude."

We note preliminarily that appellant did not make these claims in the trial court. He focused almost entirely on the presence of guns in the videos. However, we agree with appellant's characterization of the video as painfully long, profanity-laced and full of brags and boasts. It is also rambling, and full of incomprehensible or meaningless statements. For example, there is no indication of what appellant means when he says, "I ain't one of them old set trippin' ass Bloods though, homie." And saying, "I got love for the homies I got love for" is essentially meaningless. Appellant cannot even describe his own claimed crime clearly, saying his first case was "robbery accessory to a murder."

Appellant does brag and boast, but he also appears inept and unsuccessful. Although appellant goes on at some length about shooting others, he does not clearly claim to have actually shot anyone other than himself. That, he acknowledges doing twice, apparently because he was under the influence of drugs. Similarly, although appellant brags and jokes about selling drugs, he acknowledges that he is not a high level drug seller. He claims to have the "nickels" of cocaine while another man has the more valuable "dimes."

17

The overall impression from the Exhibit 5 video is that appellant is an enthusiastic and devoted member of the BSV gang who likes to talk big. Although appellant does not come across as an admirable person, it is highly unlikely that his statements in the video would "inspire the urge to punish him for his unwaveringly arrogant attitude." Also, the jury was instructed on the limited use of the videos, which further reduced potential prejudice from them. It is highly unlikely Exhibit 5 inspired the sort of prejudice which would make a limiting instruction impossible for the jury to follow.

In sum, appellant's participation in statements in the Exhibit 5 video, and the statements he makes during the video, demonstrate his strong commitment to BSV, including its criminal activities and its rivalries with other gangs. These facts support an inference that appellant was still an active gang member in 2010, and, assuming he committed the charged shootings, did so to benefit BSV. These two issues were vigorously disputed at trial. While there is prejudicial potential in any gang evidence, the images of appellant expressing his enthusiasm for gang life did increase the potential for prejudice over that found in typical dry expert testimony on a defendant's gang membership. The balance of the probative value against the prejudicial potential is very close. Given this closeness, the trial court's finding that the probative value of the video outweighed its prejudicial potential cannot be considered arbitrary or capricious, and it did not result in a manifest miscarriage of justice. (See *People v. Rodrigues, supra,* 8 Cal.4th at p. 1124.)

### e. Constitutional claims

Because there was no error in admitting the gang evidence under section 352, appellant's claim that the admission of the evidence violated his constitutional rights to due process and a fair trial fails. (See *People v. Valdez, supra,* 55 Cal.4th at p. 134.)

### 2. Section 1101

Appellant claims that the trial court abused its discretion in admitting evidence that he committed two uncharged murders, in violation of section 1101, subdivision (b).

He further contends the evidence was unduly prejudicial in violation of the federal Constitution. Appellant identifies the evidence of the murders as his statement in the Exhibit 5 video that he committed murder as a juvenile and the expert's testimony that one of appellant's tattoos indicated that appellant had probably killed a Crips gang member.[4]

Section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Appellant has forfeited the section 1101 claim. He did not object to the tattoo testimony at all. He did not object to the statement in the video on section 1101 grounds. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1208 ["As to his claim that admission of such evidence violated Evidence Code section 1101, subdivision (a), [defendant] has forfeited that claim by failing to raise it at trial"]; *People v. Valdez, supra,* 55 Cal.4th at p. 130 [same, involving gang evidence].)

Appellant acknowledges that his trial counsel did not object, but claims that there is no forfeiture because any objection would have been futile. Assuming a forfeiture did occur, appellant asks us to exercise our discretion and reach the merits of his claims because the alleged error involves fundamental constitutional rights.

While appellant did object, unsuccessfully, to the Exhibit 5 video on relevance and prejudice grounds, those objections were focused on the firearm in the video. Thus, the failure of these objections does not show that a specific objection to the murder statement on section 1101 grounds would have been futile. There is nothing at all to suggest that an objection to the tattoo would have been futile.

---

[4]     It is far from clear that the evidence shows two different murders or that the jury would have understood the evidence to be related to two different murders. The gang expert could offer no details about the murder supposedly underlying the tattoo, other than that it involved a rival gang member. Appellant's statement provided no information about the referenced murder, other than that it took place when he was a juvenile.

We decline appellant's invitation to reach the merits of his claim. We do reach appellant's section 1101 claim in deciding his ineffective assistance of counsel claim, and find that section no bar to admission. Because there was no error in admitting the gang evidence under section 1101, appellant's claim that the admission of the evidence violated his constitutional rights to due process and a fair trial, insofar as they are cognizable on appeal, fails. (See *People v. Valdez, supra,* 55 Cal.4th at p. 134.)

3. Ineffective assistance

Appellant claims that if his trial counsel forfeited either of his first two claims, then trial counsel was ineffective. We have found forfeiture of his section 1101 claim, but appellant's counsel was not ineffective in failing to object on that ground.

Appellant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) In order to establish such a claim, appellant must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citations.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 530-531.)

Here, trial counsel explained his decision not to object on section 1101 grounds. Counsel told the court, "Just to give the court some history, I at first focused on this film as if it were 1101(b) evidence, of the playing with the gun and talking about other criminal activity. [¶] And [the prosecutor] told me that he did not view it as 1101(b) evidence, and indeed he had no intention to offer it as 1101(b) evidence. [¶] And so I asked myself the question, where a 186.22 is alleged, and where the target offenses of the

20

gang includes pretty much the contents of the Penal Code, does that mean that there is no protection whatsoever against the use of uncharged conduct, which 1101(a) would otherwise make it [in]admissible. . . . And I believe the best argument is . . . that it doesn't. It does put on the court some balancing to decide whether the 403/352 criteria, at what point . . . at some point there has to be . . . some cutoff."

Section 1101 prohibits the use of evidence of specific instances of a defendant's conduct "to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) However, it does not prohibit the admission of "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." (§ 1101, subd. (b).)

As we discuss in section 1, evidence of appellant's loyalty to the gang was relevant, both to show continuing gang membership and to show that if he committed the charged crimes, he did so for the benefit of BSV. These uses are not barred by section 1101. The prosecutor stated his intent not to use the evidence for section 1101 purposes such as plan or identity. Appellant's counsel had no duty to make a meritless objection. (See *People v. McPeters* (1992) 2 Cal.4th 1148, 1173.)

Appellant's counsel was diligent in seeking limiting instructions for the evidence to prevent the jury from using it as propensity evidence. The jury was twice instructed that gang evidence did not show that appellant was a bad person or disposed to commit crimes.[5] Thus, appellant's counsel's decision to not object to any gang evidence on

---

[5] Before Exhibit 5 was shown, the trial court instructed the jury that "the purpose of this evidence is not to show that [appellant] is a bad person or anything other than to allow the People to prove gang affiliation with this particular gang and some of the activities of the gang."

Near the end of the People's case, the trial court instructed the jury on the limits of gang evidence generally, using CALCRIM No. 1403. That instruction told the jury: "Testimony has been received in this trial that the defendant was or is a member of a gang. [¶] You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose and knowledge that

21

section 1101 grounds and to focus on section 352 grounds fell "within the wide range of reasonable professional assistance." (See *People v. Thomas, supra,* 2 Cal.4th at pp. 530-531.) Appellant's claim fails.

### 4. Prosecutorial misconduct

Appellant contends the prosecutor committed misconduct during closing argument by referring to the photo of appellant that was not in evidence.

A prosecutor commits misconduct when he or she states facts not in evidence during closing argument to the jury. (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.) We agree with respondent that the prosecutor's use of the photo appears to be more of an error than intentional misconduct.[6] However characterized, the prosecutor's brief use of the photo could not have resulted in any prejudice to appellant.

During closing argument, the prosecutor reminded the jury that Rollins had taken a photo of a photo using his cell phone and pointed out that the resulting photo was "a little bit fuzzy." The prosecutor continued, "However, if you take a look at one of [appellant's] prior photos, you can see the similarity between the two." Appellant's counsel objected that the "prior" photo had not been introduced into evidence. The court agreed, and told the prosecutor to move on. The court told the prosecutor, "if it wasn't introduced, don't refer to it." The prosecutor stated, "All right. Disregard that photo, ladies and gentlemen."

---

are required to prove the gang-related enhancements charged; [¶] OR [¶] The defendant had a motive to commit the crimes charged." The instruction also told the jury the evidence could be used to evaluate the credibility of a witness or the facts relied on by an expert witness. The jury was expressly told, "You may not consider this evidence for any other purpose. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."

[6]    We do not agree with respondent that appellant forfeited this claim by failing to request an admonition. The court offered an admonition, but appellant's counsel stated his belief that an admonition was inadequate to cure the harm. Thus, we review the claim to determine if there was incurable prejudice.

The cell phone photo and the "prior" photo were both printed with the male head in each photo at the same size. They were placed side-by-side on the screen. The prosecutor's apparent intent was to argue to the jury that a comparison of the clear "prior" photo of appellant to the fuzzy cell phone photo showed that the cell phone photo was in fact of appellant. Due to appellant's counsel's prompt objection, the planned comparison never occurred. The trial court found that the photo was on the screen "for five seconds at the most." The cell phone photo is quite blurry and there was no opportunity for the jury to make any kind of comparison between the two photos in the five or fewer seconds it was on the screen. The clear prior photo is in no way inflammatory. The reporter's transcript shows that the prosecutor did not make any specific comments about any details in the photo. Thus, there is no reasonable probability or possibility that a brief glimpse of the two photos could have resulted in any prejudice to appellant, or that appellant would have received a more favorable outcome in the absence of the photo.

5. Sentence correction

Appellant contends and respondent agrees that appellant's sentence for murder and attempted murder must be corrected to delete the 10-year enhancement imposed and stayed by the trial court pursuant to Penal Code section 186.22. They are correct.

When the sentence for a crime is life in prison, a true finding on a Penal Code section 186.22 gang enhancement results in a minimum parole eligibility of 15 years on the life sentence. A consecutive 10-year determinate term for the gang enhancement should not be imposed. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004-1007.)

Both the murder and attempted murder convictions in this case have a sentence of life in prison. Thus, the 10-year determinate terms imposed by the trial court must be stricken.

6. *Pitchess* review

Appellant requests that we review the sealed transcript of the in camera hearing held after the court granted appellant's *Pitchess* motion for discovery of police officer personnel records.

The trial court granted appellant's motion for discovery of complaints of untruthfulness by Officer McKenzie. On June 22, 2014, the trial court conducted an in camera review of the records and found discoverable complaints.

When requested to do so by an appellant, we independently review the transcript of the trial court's in camera *Pitchess* hearing to determine whether the trial court disclosed all relevant complaints. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.) We have reviewed the transcript of the in camera hearing and conclude that the trial court did not abuse its discretion in identifying discoverable records to be disclosed to appellant. (See *People v. Hughes* (2002) 27 Cal.4th 287, 330 [court's ruling is reviewed for abuse of discretion].)

Disposition

The 10-year determinate terms imposed pursuant to Penal Code section 186.22 for the count 1 murder conviction and the count 2 attempted murder conviction are ordered stricken. The clerk of the superior court is instructed to prepare an amended abstract of judgment reflecting this change and to deliver a copy to the Department of Corrections and Rehabilitation. The judgment of conviction is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

GOODMAN, J.[*]

We concur:

TURNER, P.J.

KRIEGLER, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25